**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF<br><br>Smartcomm LLC,<br>Smartcomm License Services LLC,<br><br>Debtors.<br><br>_____<br><br>Carole Downs,<br><br>　　　　　Appellant,<br>vs.<br><br>Dina L Anderson,<br><br>　　　　　Appellee. | No. CV-22-01399-PHX-SPL<br><br>BK No. 2:19-bk-03343-EPB<br><br>ADV. No. 2:20-ap-00239-EPB<br><br>**ORDER** |

    Before the Court is Appellant Carole Downs' ("Downs" or "Appellant") appeal from the *Minute Entry/Order for Matter Taken Under Advisement* (Doc. 15-1 at 97–105) issued by the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") on August 3, 2022. The parties have fully briefed the issues. (Docs. 13, 22, & 29). For the following reasons, the Court reverses the Bankruptcy Court's Order on the issue of damages only and remands the case for further proceedings.[1]

---

[1] Because it would not assist in resolution of the instant issues, the Court finds this appeal suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

## I. BACKGROUND[2]

In 2007, Pendleton Waugh and Downs formed Smartcomm, LLC ("Smartcomm"), a company that operated "to provide consulting services in the wireless telecommunications industry." (Doc. 13 at 9). The following year, Smartcomm formed Smartcomm License Services, LLC ("SLS" or, together with Smartcomm, "Debtors"), which operated "to provide license application preparation services that the Federal Communications Commissions would be releasing." (*Id.*). Waugh and Downs were the co-managers of the two companies from their respective inceptions until Waugh passed away in August 2011; at that point, Downs became the sole manager, majority owner, and only decision-maker of Debtors. (Doc. 22 at 6).

In 2008, Waugh and Downs established an arrangement under which they would receive loans instead of a salary. (Doc. 13 at 10). The loans—which Downs has referred to as "advances" throughout this litigation—were documented through a series of promissory notes. (Doc. 15-1 at 98). Downs, in particular, executed such promissory notes in 2008, 2011, 2013, 2014, and 2016. (Doc. 13 at 10). The final two of these promissory notes (the "2014 Note" and the "2016 Note") were the only notes at issue in this case. (*See id.* at 10–11). Under the 2014 Note, which was executed on December 31, 2014, Downs received $3,466,635.86 from Smartcomm in exchange for her promise to repay that amount plus accrued interest at an annual rate of 2.74% by December 31, 2015. (Doc. 16 at 225). Downs does not dispute that she failed to pay the 2014 Note by December 31, 2015. (Doc. 15-1 at 98; Doc. 13 at 10–11; Doc. 16 at 103). The 2014 Note remained unpaid until November 1, 2016, when Downs executed the 2016 Note. (Doc. 16 at 227). Under the 2016 Note, Downs promised to pay Smartcomm $3,942,071.09— which represented the amount Downs owed Smartcomm, including her debt obligation

---

[2] This Background section is based on the factual background provided in Appellant's Opening Brief (Doc. 13), Appellee's Response Brief (Doc. 22), and the Record on Appeal as submitted to this Court by Appellant (Docs. 14–17).

under the 2014 Note—plus accrued interest at an annual rate of 2.07% over a 21-year term. (*Id.*; *see also* Doc. 16 at 138 (Downs explaining what the $3,942,071.09 figure represented)). The 2016 Note contained several terms which the Bankruptcy Court found to be "considerably more favorable" to Downs than the terms of the 2014 Note:

> (i) A one-year deferment of any payments;
>
> (ii) A reduction in the interest rate from 2.74% to 2.07% per annum;
>
> (iii) Following the one-year deferment, Downs was required to make quarterly, interest-only payments for ten years; after ten years (*i.e.*, beginning on November 1, 2027), Downs was required to make amortization payments toward the then-remaining principal balance for another ten-year period (*i.e.*, until 2037);
>
> (iv) The 2016 Note was unsecured;
>
> (v) The payment of the principal amount could only be accelerated "upon the sale of [Downs'] interest in Spectrum Networks Group, LLC and/or M2M Spectrum Networks, LLC (its subsidiary) if [Downs] receives net cash consideration exceeding [$10,000,000] as a result of such sale transaction."

(Doc. 16 at 227; Doc. 15-1 at 98–99). The 2016 Note specifically provided that it "supersedes and replaces any earlier dated agreement relating to payment of money from [Downs] to [Smartcomm]." (Doc. 16 at 228). The parties agreed at trial that Downs paid $577,931.48 toward the 2016 Note between 2017 and 2019. (Doc. 13 at 11).

On March 25, 2019, Smartcomm and SLS filed a voluntary bankruptcy petition in Bankruptcy Court. (Doc. 13 at 12). Appellee Dina L. Anderson ("Anderson" or "Appellee") was appointed as the Chapter 7 Trustee, and the companies' bankruptcy estates were substantively consolidated. (*Id.*). On August 24, 2020, Anderson brought an Adverse Proceeding against Downs on behalf of Debtors. (*See* First Amended Complaint, Doc. 14 at 37–51). Anderson asserted four claims: (1) breach of contract; (2) fraudulent transfer in violation of A.R.S. § 44-1004; (3) fraudulent transfer in violation of A.R.S. § 44-1005; and (4) breach of fiduciary duty. (*Id.* at 47–50). The breach of contract claim

was resolved prior to trial, and the parties stipulated to damages on that count. (*See* Doc. 15-1 at 7–8). On June 23, 2022, a bench trial was held before the Bankruptcy Court. (*See id.* at 13). On August 3, 2022, the Bankruptcy Court issued an under advisement ruling, (*see id.* at 97–105), and judgment was entered in Anderson's favor on the fraudulent transfer claims and the breach of fiduciary duty claim. (*Id.* at 121–22). With respect to the fraudulent transfer claims, the Bankruptcy Court found that the 2016 Note constituted a transfer of an asset of Smartcomm that offered Smartcomm "nothing in immediate value" and that its "only purpose was to relieve [Downs] of her immediate repayment obligation." (*Id.* at 100–01). Given the absence of any reasonably equivalent value received by Smartcomm and the Bankruptcy Court's additional finding that Smartcomm was insolvent at the time of the transfer, the Bankruptcy Court concluded that Downs' execution of the 2016 Note amounted to a fraudulent transfer in violation of A.R.S. §§ 44-1004(a)(1)–(2) and 44-1005. (*Id.* at 99–103). As to the breach of fiduciary duty claim, the Bankruptcy Court found that Downs had a fiduciary duty to Smartcomm and that she violated this duty in negotiating and executing the 2016 Note with herself. (*Id.* at 103). With respect to damages, the Bankruptcy Court concluded that the proper measure of damages was the value of the asset on November 1, 2016 (which it determined to be $3,942,071.09) minus the stipulated payments made by Downs to date ($577,931.48) plus the stipulated interest for the period of November 1, 2016 to June 1, 2022 ($206,000.00), which totaled $3,570,139.61 in damages. (*Id.* at 104).

On August 17, 2022, Downs timely filed this appeal of the Bankruptcy Court's Order. (*Id.* at 106–07). Downs argues that the Bankruptcy Court erred in: (i) finding violations of the Arizona fraudulent transfer statutes, (ii) *not* finding that Anderson's breach of fiduciary duty claim was barred by the "economic loss rule," (iii) applying the incorrect measure of damages, and (iv) *not* finding that Anderson was precluded from pursuing remedies other than for breach of contract. (Doc. 13 at 8–9). Downs requests that this Court reverse the Bankruptcy Court's judgment without remand. (*Id.* at 27). Anderson argues that (i) the Bankruptcy Court properly concluded that Downs violated

the Arizona fraudulent transfer statutes, (ii) her breach of fiduciary duty claim was *not* barred by the economic loss rule, and (iii) the Bankruptcy Court's award and calculation of damages was correct. (Doc. 22 at 18–24).

## II. STANDARDS OF REVIEW

Under 28 U.S.C. § 158(a)(1), the Court has jurisdiction over appeals from "final judgments, orders, and decrees" of bankruptcy judges. The Court reviews a bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error. *Decker v. Tramiel* ("*In re JTS Corp.*"), 617 F.3d 1102, 1109 (9th Cir. 2010); *Christensen v. Tucson Ests., Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990). "Mixed questions of law and fact are reviewed *de novo*." *In re JTS Corp.*, 617 F.3d at 1109 (quoting *In re Chang*, 163 F.3d 1138, 1140 (9th Cir. 1998)). The Court *must* accept the bankruptcy court's findings of fact unless the Court "is left with the definite and firm conviction that a mistake has been committed." *Greene v. Savage*, 583 F.3d 614, 618 (9th Cir. 2009). The Court reviews the evidence in the light most favorable to the prevailing party. *Lozier v. Auto Owners Ins. Co.*, 951 F.2d 251, 253 (9th Cir. 1991).

## III. DISCUSSION

As noted above, Downs argues that the Bankruptcy Court erred by finding a fraudulent transfer, by not finding that Anderson's breach of fiduciary duty claim was barred by the economic loss rule, and by applying the incorrect measure of damages. (*See* Doc. 13 at 8–9). The Court will address each of Downs' arguments in turn.

### A. Whether Bankruptcy Court Erred in Finding Fraudulent Transfer

Under Arizona law, "fraudulent transfers are subdivided into two categories: actually fraudulent transfers, A.R.S. [§] 44-1004(A)(1), and constructively fraudulent transfers, A.R.S. [§§] 44-1004(A)(2) and 44-1005."[3] *Hullett v. Cousin*, 204 Ariz.

---

[3] Section 44-1004 concerns transfers that are fraudulent as to present *and future* creditors, while § 44-1005 concerns transfers that are fraudulent as to present creditors only. *See* §§ 44-1004, 44-1005.

292, 295 (2003). For *actually* fraudulent transfers, the plaintiff must prove that the transfer was made with "actual intent to hinder, delay or defraud any creditor of the debtor." § 44-1004(A)(1).[4] In assessing intent, the Court must consider a series of factors provide in the statute. *See* § 44-1004(B). For *constructively* fraudulent transfers, the plaintiff need not prove an intent to defraud, but rather must show that the debtor made the transfer "without receiving a reasonably equivalent value in exchange for the transfer." §§ 44-1004(A)(2), 44-1005. The plaintiff must additionally show—at least for a claim under § 44-1005—that "the debtor was insolvent at the time [of the transfer] or . . . became insolvent as a result of the transfer."[5] § 44-1005.

As noted above, the Bankruptcy Court found that Downs' execution of the 2016 Note constituted a fraudulent transfer in violation of §§ 44-1004(A)(1)–(2) and 44-1005. (Doc. 15-1 at 100–03). Now on appeal, Downs argues that the Bankruptcy Court erred in finding that (i) Anderson established a lack of reasonably equivalent value between the 2014 Note and the 2016 Note, and (ii) Anderson established that Smartcomm was insolvent on the date of the transfer. (Doc. 13 at 13–18 & 22–24). The Court is unpersuaded by either argument, as explained below.

### *1. Reasonably Equivalent Value Determination*

"The analysis for determining reasonably equivalent value is directed at

---

[4] Section 44-1004(A)(1) provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor."

[5] Constructive fraud claims under § 44-1004(A)(2) require the plaintiff to prove—in addition to the "reasonably equivalent value" element—that the debtor either (i) "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or (ii) "[i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." § 44-1004(A)(2)(a)–(b).

comparing what the debtor surrendered and what the debtor received in return." *In re Viscount Air Servs., Inc.*, 232 B.R. 416, 434 (Bankr. D. Ariz. 1998) (citing *In re United Energy Corp.*, 944 F.2d 589, 597 (9th Cir. 1991)). "[T]he court evaluates whether what the debtor received was 'in the range of a reasonable measure of the value' of what the debtor transferred." *United States v. Hernandez*, No. CV 11–0250–TUC–DCB (JR), 2013 WL 627230, at *6 (D. Ariz. Jan. 17, 2013) (quoting *Viscount Air Servs.*, 232 B.R. at 434). Reasonably equivalent value "exists when from 'all circumstances considered, there is a reasonable and fair proportion between the one and the other.'" *Viscount Air Servs.*, 232 B.R. at 434 (alteration omitted) (quoting *Zellerbach Paper Co. v. Valley Nat'l Bank*, 13 Ariz. App. 431, 436 (1970)). "The assets involved in the contested transfer should be measured at their market value at the time of transfer." *Id.* (citation omitted). "One benchmark utilized by the courts is that a value to the debtor within 70% of the creditor's recovery is 'reasonably equivalent.'" *Id.* (citation omitted).

The Court reviews *de novo* "whether a particular type of consideration constitutes 'value'" in the first place. *In re Castle Trading, Inc.*, 2:14–ap–01022–BB, 2017 WL 2375493, at *4 (9th Cir. BAP May 31, 2017) (citation omitted). However, the Court reviews the Bankruptcy Court's ultimate finding on the reasonably equivalent value element for clear error only. *See id.* (quoting *In re JTS Corp.*, 617 F.3d at 1109) ("But when we consider whether the value is 'reasonably equivalent,' a finding concerning the value of the transferred property 'is a finding of fact which may be reversed only if it is shown that it was clearly erroneous.'"); *see also In re UC Lofts on 4th, LLC*, No. 07–90139–CL, 2015 WL 5209252, at *15 (9th Cir. BAP Sept. 4, 2015) (citations omitted) ("[T]he Ninth Circuit later applied the clearly erroneous standard of review to the bankruptcy court's determination of reasonably equivalent value. . . . Accordingly, because we are not convinced otherwise, we follow the clearly erroneous standard adopted in *JTS* and the weight of authority in other circuits and consider the issue a question of fact.").

Here, there is no dispute that the "value" given up by Smartcomm was its right to

immediate repayment of Downs' debt obligation. Indeed, the Bankruptcy Court recognized this right to repayment as an "immediately due and payable asset" after finding "no credible evidence that this debt was not immediately collectable." (Doc. 15-1 at 100). The Bankruptcy Court noted the definition of "transfer" under Arizona's Uniform Fraudulent Transfer Act and found that the execution of the 2016 Note—which extinguished Smartcomm's right to repayment under the 2014 Note—"constituted a transfer of an asset."[6] (*Id.*). The Bankruptcy Court noted that Downs also received more favorable terms as a result of the transfer:

> The 2016 Note extinguished this immediately due and payable asset and extended meaningful collection on the indebtedness by twenty-one years. As noted above, it also increased the indebtedness to $3,942,071.09, lowered the interest rate to 2.07%, deferred any payments for a year, then provided ten years of interest-only payments, and amortized the principal over an additional ten years. There were also no default provisions upon [Downs'] failure to make any of the required payments. [Downs] *took a valuable asset and rendered it practically worthless*.

(Doc. 15-1 at 100–01 (emphasis added)). Downs does not dispute that Smartcomm's right to repayment was a valuable asset nor that the execution of the 2016 Note amounted to a transfer of that asset and provided more favorable terms to Downs.

With respect to whether Smartcomm received reasonably equivalent value, the Bankruptcy Court concluded that the value Smartcomm gave to Downs—extending her repayment obligation by two decades and otherwise providing her with more favorable terms—"was not reasonably equivalent to anything Smartcomm received." (*Id.* at 101). The Bankruptcy Court went further, concluding that "[i]n fact, the Court is hard pressed

---

[6] "A transfer is defined as 'every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease and creation of a lien or other encumbrance.'" (Doc. 15-1 at 100 (citing A.R.S. § 44-1001(9))). "This broad definition of a 'transfer' includes any transaction in which a property interest is relinquished." *Moirbia Scottsdale, LLC v. Bonnett*, No. 1 CA-CV 18-0055, 2019 WL 386397, at *3 (Ct. App. Ariz. Jan. 31, 2019) (citation omitted).

8

to find that Smartcomm received *anything* of value in return" and that "[t]he only one who benefited was [Downs]." (*Id.* (emphasis added)). The Bankruptcy Court concluded:

> Further, Smartcomm's estimation in its Schedules as to the value of the 2016 Note, coupled with its extremely unfavorable terms compared to the 2014 Note, not only establishes that the 2016 Note had negligible value compared to the former instrument, it also evidences an attempt by [Downs] to insulate herself from collection. . . . The 2016 Note offered Smartcomm nothing in immediate value. Its only purpose was to relieve [Downs] of her immediate repayment obligation.

(*Id.*). In sum, the Bankruptcy Court found that Smartcomm did not receive *any* value from the transaction, let alone reasonably equivalent value.

Downs argues that the 2016 Note satisfied the 2014 Note, and that such satisfaction of debt amounted to value received by Smartcomm. (Doc. 13 at 17, 22–23). The Court is unpersuaded. There is no evidence that Downs' debt under the 2014 Note was satisfied. The terms of the 2016 Note say nothing about the 2014 Note's debt being satisfied or otherwise paid off; rather, the terms expressly provide that the 2014 Note was merely "supersede[d] and replace[d]." (Doc. 16 at 228 ("This Note supersedes and replaces any earlier dated agreement relating to payment of money from [Downs] to [Smartcomm].")). Moreover, the parties agree that Downs failed to pay the 2014 Note. (*See* Doc. 13 at 10 ("The 2014 Note was due on Dec[ember] 31, 2015, but it was not paid when it was . . . replaced by the 2016 Note."); Doc. 22 at 8 ("Downs did not pay the 2014 Note.") & 19 ("There is no dispute that Downs failed to pay the 2014 Note."); Doc. 16 at 103 (Downs responding "That's correct" when asked to confirm that she did not pay off the 2014 Note)). The Court rejects Downs' argument that her debt under the 2014 Note was satisfied by the execution of the 2016 Note and finds that the 2016 Note merely extended Downs' repayment schedule to 21 years and provided her with more favorable terms.

Downs next contends that Anderson's testimony and discovery responses were inconsistent with her trial declaration as it relates to whether the 2016 Note was

supported by consideration. (Doc. 13 at 17). In her June 13, 2022 declaration, Anderson states that "[t]here was no known consideration for the 2016 Note." (Doc. 14-1 at 205). In contrast, on November 11, 2021, Anderson checked "Admit" in responding to Downs' "Request for Admissions No. 15," which stated, "Admit that the Downs Note is supported by consideration." (Doc. 17 at 132). Likewise, on June 23, 2022—during the bench trial before the Bankruptcy Court—Anderson was asked whether she agreed "that there was some consideration for the 2016 note." (Doc. 16 at 88–89). In response, Anderson stated, "Yes because it supersedes prior notes." (*Id.* at 89). The Court does not find such a minor inconsistency in Anderson's testimony to support a complete reversal of the Bankruptcy Court's ruling on this issue, especially given that the Bankruptcy Court's decision does not even reference Anderson's testimony regarding consideration, let alone imply that the "reasonably equivalent value" finding was meaningfully based on such testimony.

Next, Downs asserts that Anderson's "trial declaration contained a conclusory statement that there lacked reasonably equivalent value, but that statement did not establish that the 2016 Note was not of reasonably equivalent value to the 2014 Note." (Doc. 13 at 17). Downs is referring to paragraph 42 of Anderson's June 13, 2022 declaration, which states: "Considering the terms of the 2016 Note and the fact that the 2014 Note was immediately due and payable in the amount of $3,942,071.08 as of November 1, 2016, the 2016 Note is not reasonably equivalent to the value of the 2014 Note." (Doc. 14-1 at 205). Again, Downs' argument is unpersuasive because the Bankruptcy Court did not expressly rely on Anderson's trial declaration to support its conclusion on this issue. Rather, the Bankruptcy Court considered the entire record of evidence before it in analyzing the "reasonably equivalent value" issue—namely, the specific sums of money involved in and the repayment terms of the 2014 and 2016 Notes.

Finally, Downs argues that it was not even possible for the Bankruptcy Court "to make findings of the value of, or difference in values between, the 2014 and 2016 Notes because [Anderson] did not introduce evidence of the value of either [] Note as of

Nov[ember] 1, 2016 [and Anderson] testified that she could not provide the value of any of the Notes." (Doc. 13 at 23). Downs cites to Anderson's trial testimony that she did not believe that she could provide "the value of any note until [she] tr[ied] to market it on the open market or try to collect on it." (Doc. 16 at 61). The Court is unpersuaded. The Bankruptcy Court found that the 2014 Note—and Downs' obligation to repay her debts to Smartcomm—was rendered "practically worthless" in light of the extremely favorable terms provided in the 2016 Note. (Doc. 15-1 at 101). The Bankruptcy Court found that Smartcomm did not receive *anything* of value in return for allowing Downs to delay repayment of her debts to the company for over two decades into the future. (*Id.*). Regardless of the "market value" of the Notes, the fact is that the 2016 Note was executed purely for the benefit of Downs—that is, "to relieve [her] of her immediate repayment obligation." (*Id.*). The Bankruptcy Court was unable to identify any benefit that Smartcomm received as a result of the transaction. Now on appeal, Downs' Opening and Reply Briefs also fail to identify *any* value that Smartcomm received. In the total absence of any such benefit or value to Smartcomm, it is impossible to find that Smartcomm received "reasonably equivalent value" in the transaction. This Court finds that the Bankruptcy Court did not clearly err in its "reasonably equivalent value" determination.

### *2. Insolvency Determination*

As noted above, a plaintiff asserting a claim for constructively fraudulent transfer must demonstrate that "the debtor was insolvent at [the time of the transfer] or the debtor became insolvent as a result of the transfer." § 44-1005. "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." § 44-1002(A). "A debtor who is generally not paying his debts as they become due is presumed to be insolvent." § 44-1002(B). Insolvency is determined at the time of the allegedly fraudulent transfer. *See Hullett*, 204 Ariz. at 297. "A finding of insolvency . . . depends on an actual analysis of assets and liabilities—a 'fact-and-figure balancing'— rather than mere conclusory statements." *Transamerica Ins. Co. v. Trout*, 145 Ariz. 355,

360 (Ct. App. 1985) (citing *Hay v. Duskin*, 9 Ariz. App. 599, 603 (1969)). The Court reviews the Bankruptcy Court's insolvency determination for clear error. *See In re Weinberg*, 410 B.R. 19, 27–28 (9th Cir. BAP 2009) (citation omitted) ("The bankruptcy court's determinations regarding insolvency resolve questions of fact which are reviewed for clear error.").

The Bankruptcy Court found that Smartcomm was insolvent at the time of the transfer on November 1, 2016 and remained insolvent thereafter. (Doc. 15-1 at 102). In making this conclusion, the Bankruptcy Court relied on Smartcomm's October 31 and December 31, 2016 balance sheets, each of which showed assets of approximately $12,624,000 and liabilities of approximately $16,400,000. (*Id.*). The Bankruptcy Court rejected Downs' assertion that Smartcomm held as an asset a $28 million state court judgment, reasoning that Downs had listed the judgment as uncollectable in Smartcomm's bankruptcy schedules and the judgment was not listed as an asset on Smartcomm's 2016 balance sheets. (*Id.*). The Bankruptcy Court also rejected Downs' argument that Smartcomm's insolvency must be determined by looking at the *consolidated* financials for Smartcomm and SLS. (*Id.*). The Bankruptcy Court explained that "[w]hile the two debtors are consolidated for bankruptcy purposes and tax filing purposes, they were in fact two separate companies that otherwise kept separate and independent financial records." (*Id.*). Nonetheless, the Bankruptcy Court considered the companies' consolidated 2016 tax return, noting that it showed assets of $20,756,000 and "other liabilities" of over $24,631,000 and that Downs did not dispute this at trial. (*Id.* at 102–03).

Downs argues that Anderson failed to "present evidence that Smartcomm's debts were greater than its assets at fair valuation" because Anderson only offered balance sheets for dates *other than* November 1, 2016, and because Smartcomm's 2016 tax return does not reflect the company's financial condition on that day.[7] (Doc. 13 at 14, 16). As a

---

[7] Downs also appears to argue that the balance sheets were unreliable because they "were prepared by someone paid by [Anderson]." (Doc. 13 at 23–24). To support this,

result, Downs argues that Anderson "failed to introduce any competent evidence of Smartcomm's financial condition on Nov[ember] 1, 2016" and that the Bankruptcy Court erred in determining Smartcomm's solvency in the absence of such evidence. (*Id.* at 23–24). The Court is unpersuaded. As Anderson points out, (*see* Doc. 22 at 21), a court "may apply the principles of retrojection and projection to find that a debtor was insolvent at the time of the transfer." *In re Shankar*, Bankr. No. 05-33880DMLS, 2008 WL 962865, at *1 (Bankr. N.D. Cal. Apr. 7, 2008) (citing *In re Mama D'Angelo, Inc.*, 55 F.3d 552, 554 (10th Cir. 1995); *In re Arrowhead Gardens, Inc.*, 32 B.R. 296, 301 (Bankr. D. Mass. 1983)). "Those principles permit the use of insolvency evidence on a date before and after the preference date as competent evidence to meet the burden of proof on the issue of insolvency, absent any substantial changes in the debtor's assets or liabilities during the intervening period." *Id.* (citation omitted). Here, the balance sheets expressly relied upon by the Bankruptcy Court were from just one day *before* the transaction and from approximately two months *after* the transaction. (*See* Doc. 15-1 at 102). The Court finds this to be more than sufficient evidence of Smartcomm's insolvency, particularly given that Downs has failed to offer—either before the Bankruptcy Court or before this Court now on appeal—any specific evidence showing that Smartcomm's assets and liabilities were meaningfully different on November 1, 2016. *See In re Shankar*, 2008 WL 962865 at *1–2 (finding that plaintiff proved debtor's insolvency on date of transfer where evidence showed debtor's financial condition six months *prior to* transfer date and one year *after* transfer date, and where there was no evidence of any substantial change in debtor's financial condition during intervening period).

---

Downs cites to Anderson's trial testimony in which she acknowledges that "trial Exhibit 14" was created by Ms. Sara Baretta. (Doc. 16 at 56–57). Trial Exhibit 14, however, is not a balance sheet but rather a QuickBooks "Transactions by Account" spreadsheet. (*See id.* at 231–35). Thus, even assuming it were appropriate to discredit the reliability of the balance sheets solely because they were prepared by someone paid by Anderson—a proposition that Downs fails to provide any legal support for—the Court would remain unpersuaded because Downs' citations to the record do not even show that the balance sheets in this case were prepared in such a manner.

Second, Downs argues that the balance sheets admitted to the Bankruptcy Court "did not reflect the consolidated nature of Smartcomm and SLS" and that the Bankruptcy Court otherwise failed to account for the effect that the companies' consolidated nature had on their financial state. (*Id.* at 15–16). Downs explains that the liabilities listed on the balance sheets are not actually liabilities at all because they represented debts owed from Smartcomm to SLS; according to Downs, the consolidated nature of the two companies means that Smartcomm's obligation to SLS is a liability and SLS's receivable from Smartcomm is an asset, and that they cancel one another out. (*Id.* at 15). Downs further explains that "Smartcomm's 'liability' to SLS was not an actual liability but reflected deferred revenues associated with revenue that would be recognized when applications would be filed with the FCC, at which time the 'liability' would become an 'asset.'" (*Id.*). In sum, Downs' argument is that the $16,454,383.22 figure from the October 31, 2016 balance sheet "was not a true liability or money owed, but was deferred revenue." (*Id.*).

The Bankruptcy Court expressly rejected this exact argument from Downs, finding that Downs' "*confusing* testimony regarding Smartcomm's tax returns and balance sheets relating to deferred revenue and liabilities *was not credible*." (Doc. 15-1 at 103 (emphasis added)). This Court finds no clear error in the Bankruptcy Court's finding, and it will not second-guess the conclusions of the Bankruptcy Judge, who had the benefit of hearing and seeing the relevant testimony firsthand and made an informed decision as to the credibility of such testimony. *See In re Ashley*, 903 F.2d 599, 606 (9th Cir. 1990) (quoting *United States v. Lummi Indian Tribe*, 841 F.2d 317, 319 (9th Cir. 1988)) ("As appellate courts, however, neither the district court nor this court may disturb the 'quintessentially factual determination' of credibility 'in the absence of clear error.'"). Moreover, Anderson argues in the Response that "Smartcomm was insolvent *regardless* of whether its financials are considered on a singular or on a consolidated basis with SLS." (Doc. 22 at 10 (emphasis added)). Anderson then discusses the various financial records that were made available to and considered by the Bankruptcy Court, which demonstrate that Smartcomm's liabilities exceeded their assets during all relevant times.

(*Id.* at 10–11). Downs does not respond to Anderson's arguments in the Reply brief; in fact, Downs fails to even raise the insolvency issue in the Reply. (*See generally* Doc. 29). The Court concludes that the Bankruptcy Court did not commit any clear error in finding Smartcomm insolvent at the time of the transfer on November 1, 2016.

### B. Whether Bankruptcy Court Erred by Not Applying Economic Loss Rule

The economic loss rule ("ELR") is "a common law rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 232 (2010). Downs argues that the Bankruptcy Court erred by failing to find that the ELR barred Anderson's breach of fiduciary duty claim because Anderson "did not allege or offer evidence of physical injury to persons or property." (Doc. 13 at 24). Whether the breach of fiduciary duty claim was barred by the economic loss rule is an issue of law that this Court reviews *de novo*. *See Flagstaff Affordable Hous.*, 223 Ariz. at 322 (citation omitted) ("The scope of the economic loss doctrine presents a legal issue that we review *de novo*.").

In *Gosnell*, the Ninth Circuit reversed the district court's affirmance of the bankruptcy court's order granting the defendant's motion for summary judgment on the ground that the plaintiff's proof of claim was barred by the ELR. *In re Gosnell Dev. Corp. of Ariz.*, 331 Fed. Appx. 440, 442 (9th Cir. 2009). In doing so, the Ninth Circuit analyzed Arizona law and found that it did not support application of the ELR to bar a breach of fiduciary duty claim:

> To date, Arizona appellate courts have not addressed whether the [ELR] could bar a breach of fiduciary duty claim. However, the Court of Appeals of Arizona has on several occasions permitted a partner to recover (or at least pursue) solely pecuniary damages from another partner that breached his or her fiduciary duty to the partnership, while acting under an oral or written partnership agreement, with no mention of the [ELR]. . . . At the same time, Arizona state courts have limited application of the [ELR] to product liability and construction defect cases. We find no basis for believing that the law of Arizona currently allows a broader application.

> Nor do the principles behind the rule urge its application here. The [ELR] seeks to keep purely economic claims from encroaching upon certain torts, where: (1) physical injury is a requirement of the alleged tort; and (2) an underlying contract shows the parties already bargained for and allocated their risk of loss. . . . With regard to breach of fiduciary duty claims, physical injury is neither required nor expected. Further, the bargaining and risk allocation that is assumed in the contractual arena cannot be assumed in the context of a fiduciary relationship.

*Id.* at 441–42 (internal citations omitted).

The Court finds the Ninth Circuit's reasoning in *Gosnell* to be persuasive and rejects Downs' argument that the Bankruptcy Court should have applied the ELR to bar Anderson's breach of fiduciary duty claim. Downs fails to cite any cases in which an Arizona court has applied the ELR to a claim for breach of fiduciary duty.[8] Moreover, Downs' argument on the issue is brief, merely stating that ELR applies because Anderson did not allege or offer evidence of physical injury to persons or property. The Court is unpersuaded. The Bankruptcy Court did not err by failing to find that the ELR barred Anderson's breach of fiduciary duty claim. *See B2B CFO Partners, LLC v. Kaufman*, 856 F. Supp. 2d 1084, 1096 (D. Ariz. 2012) (rejecting the defendant's argument that ELR barred the plaintiff's breach of fiduciary duty claim).

### C. Whether Bankruptcy Court Erred in Calculating Damages

The Bankruptcy Court relied on A.R.S. §§ 44-1007 and 44-1008 in calculating damages. (*See* Doc. 15-1 at 104). Section 44-1007 provides that a court may avoid a fraudulent transfer "to the extent necessary to satisfy the creditor's claim." § 44-

---

[8] The only case cited by Downs in support of her argument is *Cook v. Orkin Exterminating Co., Inc.*, 227 Ariz. 331 (Ct. App. 2011). Having fully reviewed the case, the Court finds that Downs misconstrues it. In *Cook*, the court upheld the lower court's granting of summary judgment to the defendant on the breach of fiduciary duty claim because it agreed that no fiduciary relationship existed, *not* because of application of the ELR. *See Cook*, 227 Ariz. at 333–34. The *Cook* court's discussion of the ELR, in contrast, was specific to the plaintiff's separate tort claims. *See id.* at 334–35 (emphasis added) ("Because the Cooks are seeking remedies for purely economic loss from Orkin's alleged failure to adequately perform its promises under the Agreement, the ELR bars *their tort claims*."). In sum, *Cook* is wholly unsupportive of Downs' position.

1007(A)(2). Section 44-1008(B) provides as follows:

> [T]o the extent a transfer is voidable in an action by a creditor under § 44-1007, subsection A, paragraph [2], the creditor may recover judgment *for the value of the asset transferred*, as adjusted under subsection C of this section, or *the amount necessary to satisfy the creditor's claim*, whichever is less.

§ 44-1008(B) (emphasis added). Subsection C states that "[i]f the judgment under subsection B of this section is based on the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require." § 44-1008(C).

The Bankruptcy Court based its judgment on the value of the asset fraudulently transferred, subject to equitable adjustments. (Doc. 15-1 at 104). Specifically, the Bankruptcy Court found the value of the asset on November 1, 2016 (the date of the transfer) to be $3,942,071.09. (*Id.*). The Bankruptcy Court then subjected this amount to two equitable adjustments. First, the Bankruptcy Court *subtracted* $577,931.48, which represented the payments made by Downs on the 2016 Note, as stipulated by the parties. (*Id.*). Second, the Bankruptcy Court *added* $206,000.00, which represented the interest owing on the 2016 Note as of June 1, 2022, as stipulated by the parties. (*Id.*). In sum, the Bankruptcy Court found damages to be $3,570,139.61, (*see id.*), which was less than the damages requested by Anderson ($4,042,352.89 or, alternatively, $3,897,045.14). (*See* Doc. 15-1 at 42). The Bankruptcy Court also rejected Downs' requested damages—which she calculated to be just $206,000—because Downs failed to provide any evidence or law to support the damages figure. (Doc. 15-1 at 104).

The fraudulent transaction that was avoided in this case was Downs' execution of the 2016 Note. The asset transferred in that transaction was Downs' repayment obligation to Smartcomm, pursuant to the 2014 Note. In this Court's view, the *value* of this asset was the face value of the 2014 Note, plus any interest that had accrued. The Bankruptcy Court, however, found the value of this asset to be equal to the face value of the 2016 Note—$3,942,071.09. (*See* Doc. 15-1 at 104). As Downs points out, it is mathematically

impossible "that the 2014 Note in the amount of $3,466,635.86, with 2.74% interest for one year (Dec[ember] 31, 2014–Dec[ember] 31, 2015), or even through Nov[ember] 1, 2016, could equal $3,942,071.09." (Doc. 13 at 26). Consequently, the 2016 Note's $3,942,071.09 figure must have included some transfer of *additional* funds. Downs appears to acknowledge this at one point in her testimony, after being asked whether she knew what the 2016 Note's value represented. (Doc. 16 at 138). Downs responded:

> Well, it was—everything carried forward from the 2014 [N]ote and the best I can tell is that the attorney and the CPA came up with the interest that was due and added the interest on because I hadn't borrowed any more money between 2014 and . . . this note, so *I think that was added on was the license preparation fees* that I did borrow the money for. *And I think that was added on right at the end* for this note, so I think it was *a combination of that* and interest and that was the . . . figure they came up with.

(*Id.* (emphasis added)). To be sure, Downs offered other testimony conflicting with this statement, as Downs twice denied that the 2016 Note provided her with any new funds. (*See* Doc. 16 at 104 (Downs testifying that the 2016 Note merely *replaced* the 2014 Note and did not represent an "additional note" or debt obligation incurred) & at 144–45 (Downs responding "No" when asked whether she received any "new funds" when she signed 2016 Note)). However, the fact is that the $3,942,071.09 figure represents a value greater than any possible value of the 2014 Note plus interest, meaning that it must have included at least some additional funds that were not part of the 2014 Note.

The Court finds that such additional funds should not have been included in the Bankruptcy Court's valuation of the asset transferred. The purpose of avoiding the fraudulent transfer—that is, the purpose of avoiding Downs' execution of the 2016 Note—is to place the parties in the same position they would have been in had the fraudulent transfer never occurred. *See Warne Invs., Ltd. v. Higgins*, 219 Ariz. 186, 198 (Ct. App. 2008) ("By limiting liability to the value of the transferred assets, the creditor is placed in essentially the same position that it was before the transfer."). In this case, absent the 2016 Note, Downs would have been liable only for the debt incurred as a

result of the 2014 Note—the value of that note, plus any interest accrued. The Bankruptcy Court's order fails to explain why it chose to value the transferred asset at the face value of the 2016 Note. In the absence of such explanation, this Court can only conclude that the Bankruptcy Court erred by overvaluing the asset at $3,942,071.09.

Importantly, the Court does *not* find that the Bankruptcy Court erred in the overall manner in which it calculated damages. As explained above, the Bankruptcy Court correctly found that a fraudulent transaction occurred and that the 2016 Note was voidable. In accordance with § 44-1008, the Bankruptcy Court attempted to identify the value of the asset transferred on the relevant date—November 1, 2016—and equitably adjusted that value by adding the interest accrued on the debt and subtracting the payments Down had already made, per the parties' stipulations. The Bankruptcy Court's only clear error was valuing the transferred asset as the amount Downs owed to Smartcomm *after* the 2016 Note was executed rather than the amount Downs owed to Smartcomm *before* the fraudulent transaction occurred.

The Court finds that remand is appropriate so that the Bankruptcy Court may reconsider its damages calculation in a manner that addresses the concerns raised in this Order or otherwise provide an adequate explanation for its award of damages in this case. The Bankruptcy Court may also consider Downs' argument that Anderson was awarded damages under alternative theories and Anderson's response that Downs waived any election of remedies argument by not asserting it at the appropriate time. (*See* Docs. 13 at 27, 22 at 25, & 29 at 14–15).

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that the August 3, 2022 Order and Judgment of the United States Bankruptcy Court is **reversed**. This matter is **remanded** to the United States Bankruptcy Court for further proceedings consistent with this Order.

///

///

**IT IS FURTHER ORDERED** that the Clerk of Court shall **enter judgment accordingly** and **terminate** this case.

Dated this 5th day of June, 2023.

_____
Honorable Steven P. Logan
United States District Judge